### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 05-09-P-S** |
| | ) | |
| **JOSEPH PELLETIER,** | ) | |
| | ) | |
| **Defendant** | ) | |

### RECOMMENDED DECISION ON MOTION TO SUPPRESS

Joseph Pelletier, charged with intentionally possessing, with intent to distribute, a mixture or substance containing heroin in violation of 21 U.S.C. § 841(a)(1), seeks to suppress evidence seized and statements made in connection with his arrest at an Augusta, Maine motel on January 21, 2005. *See* Indictment (Docket No. 1); Motion To Suppress Evidence, etc. ("Motion") (Docket No. 25) at 1-4.[1] An evidentiary hearing was held before me on June 29, 2005 at which the defendant appeared with counsel. The government called three witnesses and offered five exhibits, all of which were admitted. The defendant testified on his own behalf and offered five exhibits, all of which were admitted. Counsel for both sides argued orally at hearing and later submitted post-hearing briefs. With the benefit of the parties' written and oral arguments, and based on the evidence adduced at the hearing, I recommend that the following findings of fact be adopted and that the motion to suppress be denied.

### I.  Proposed Findings of Fact

On January 20, 2005 Deputy United States Marshal Christopher Clifford, a warrant coordinator for the United States Marshals Service ("Marshals Service"), learned from a colleague,

---

[1] The defendant's residence at 953 Augusta Road in Bowdoin, Maine (the "Augusta Road Residence") was searched on the day of his arrest in Augusta.  At hearing, defense counsel stated that he did not challenge that search based on government counsel's *(continued on next page)*

Deputy United States Marshal Lisa Aungst, that federal parolee Joseph Pelletier was the subject of an arrest warrant. The United States Parole Commission had issued the warrant on December 30, 2004 based on violations of parole conditions evidenced by several urine specimens that had tested positive for the presence of cocaine. *See* Gov't Exh. 4. Aungst sought Clifford's help in executing the arrest warrant, which she planned to do the following day.

Aungst informed Clifford that she had been coordinating with the Maine Drug Enforcement Agency ("MDEA") and the Topsham Police Department ("TPD"), which had been conducting an investigation into alleged narcotics dealing on Pelletier's part and had obtained a state "no knock" warrant to search the Augusta Road Residence. *See* Gov't Exh. 1A.[2] Members of the Marshals Service, the MDEA, the TPD and a federal Drug Enforcement Agency ("DEA")-High Intensity Drug Trafficking Area ("HIDTA") task force were to meet early the next morning to go over an "operational plan" pursuant to which they would attempt to execute the arrest and search warrants simultaneously. The Marshals Service had called in DEA-HIDTA task force members to serve in an "assist mode" with respect to the execution of both warrants. Such coordination among agencies is not unusual; they do so for purposes of intelligence-gathering, officer safety (so that each agency knows others are involved and may be present at a scene) and efficiency (with warrants being executed simultaneously).

Prior to the meeting, Clifford, who was not previously familiar with Pelletier, reviewed a DEA-HIDTA task force file on Pelletier, talked to some agents who had been involved in effectuating prior arrests of him and performed his own surveillance of the Augusta Road Residence, during which

---

representation that the government would not seek to introduce as evidence in this matter any fruits of the Augusta Road Residence search. Government counsel affirmed that this was the case.

[2] The warrant was a so-called "no knock" warrant inasmuch as it permitted law-enforcement officers to execute it without providing notice of the officers' purpose and office. *See* Gov't Exh. 1A at [3].

he observed the defendant letting out a dog.[3]  One of the officers with whom he spoke, a Detective Lussier of the Maine State Police, told him that approximately ten years earlier someone had been shot and killed inside Pelletier's home as a result of a drug deal gone bad.[4]  Clifford also learned from Aungst that there were surveillance cameras mounted outside the residence – a fact that raised concerns about officer safety because the defendant could see the police approaching and prepare himself.  Aungst told Clifford, as well, that there was a trap door in the bedroom of the Augusta Road Residence.

Prior to the meeting, Clifford also spoke with TPD Detective Mark Gilliam, who informed him that he had attempted to execute a warrant for Pelletier's arrest at the Augusta Road Residence earlier that month and did not find Pelletier at home.  Clifford was aware that Gilliam did not observe any guns, ammunition, explosives or drugs while there.  Clifford knew from Pelletier's NCIC criminal-history report that Pelletier was charged with possession of firearms in 1990.  He did not remember having being aware prior to Pelletier's arrest that the firearms charge was dismissed in 1991, although he acknowledged on cross-examination that the NCIC report showed that it was.  He testified that nonetheless the dismissal of the charge was not particularly significant to him.  He explained that he was concerned at the time about officer safety, and, per his training and experience, if someone carried a firearm in the past, the person was likely to carry one again.  Prior to Pelletier's arrest, Clifford had no information from any source that (i) there were guns in the Augusta Road Residence, (ii) Pelletier currently possessed a firearm, (iii) Pelletier had ever threatened a law-enforcement officer or (iv)

---

[3] Statements of Clifford and other government witnesses regarding what they learned from others about Pelletier were admitted not for the truth of the underlying assertions but to show what they knew or believed as of the time of effectuation of Pelletier's arrest.  In its post-hearing brief, the government belatedly submitted authority for the proposition that hearsay is admissible at suppression hearings regardless whether an exception to the hearsay rule obtains.  *See* Government's Supplemental Brief in Opposition to Defendant's Motion To Suppress Evidence ("Government's Post-Hearing Brief") (Docket No. 44) at 11-12.  Because this assertion comes too late and is any event immaterial to the analysis that follows, I decline to consider it.

apart from the Jack Frost incident, Pelletier had been involved in a violent incident of any kind. Gilliam, as well, had received no report that Pelletier possessed a firearm.

The operational meeting regarding the Pelletier warrants took place early on the morning of January 21, 2005.[5] At the meeting, Clifford learned that Pelletier was allegedly dealing a greater volume of narcotics than Clifford originally had believed. He recalled that the Jack Frost shooting was mentioned, as were the contents of an affidavit of MDEA Special Agent Lowell Woodman, Jr., submitted in support of the no-knock warrant to search the Augusta Road Residence. *See* Gov't Exh. 1B. Two other meeting attendees, Gilliam and DEA-HIDTA task force agent Steven Thibodeau, also recalled mention of the Jack Frost incident. Thibodeau remembered "something being mentioned about Mr. Pelletier and a shooting years ago, but it was very vague." Thibodeau did not learn that Pelletier was never charged in connection with the incident. Gilliam, who described the incident as "common knowledge" in the Brunswick area, was aware prior to the meeting that Frost had attempted an armed robbery of Pelletier and, so far as Gilliam knew, Pelletier was not charged in connection with the incident.

Neither Clifford nor Thibodeau personally reviewed the Woodman affidavit, and it is unclear whether Gilliam did. In that affidavit Woodman averred, *inter alia,* that he had been informed on January 13, 2005 by a reliable confidential informant that he/she had been purchasing cocaine and heroin since November 2004 from two individuals, Johnny "D" and "Pops," the latter also known as "Fred." *See* Gov't Exh. 1B at 3. He/she stated that he/she was purchasing up to twenty-eight bags of heroin daily and between one-eighth and one-quarter of an ounce of cocaine daily from those two

---

[4] Clifford originally recalled the decedent's name as "Snow," but acknowledged on cross-examination that his name was Jack Frost.
[5] The operational meeting also concerned a state warrant to search the house of an alleged confederate of Pelletier. That warrant was not introduced into evidence and is not material to resolution of the instant motion.

individuals, who were dealing the substances from their residences.  *See id.* at 4.  He/she also told

police that Pops was on parole, and both Pops and Johnny D had told him/her that Pops was being

sought by law enforcement.  *See id*.  Based on the confidential informant's description of Pops/Fred

and his residence, Woodman identified him as Pelletier.  *See id*. at 5.  Woodman also learned on

January 20, 2005 that Gilliam had received an anonymous phone call reporting that "Freddy" Joseph

Pelletier of the Augusta Road in Topsham was dealing cocaine.  *See id*. at 6.  With respect to

Pelletier's background, Woodman stated:

> On Thursday, January 20, 2004 I was supplied Pelletier's NCIC criminal history by
> the U.S. Marshall service [sic].  I found that Pelletier has been convicted of Interstate
> transport of a stolen motor vehicle in 1975, Possession of burglar's tools in 1978,
> Conspiracy to possess with intent to distribute cocaine in 1986, Aggravated
> Trafficking [in] Schedule Drugs, Unlawful Possession of Schedule Drugs in 1995, and
> several parole violations.  I was also advised that in 1994 Pelletier was involved in a
> homicide at his residence that was a drug deal that went bad or an attempted robbery
> where a person was shot and killed within his residence.  Pelletier was not charged
> with murder or any other personal crime involving this case according to his criminal
> records check.  I spoke to Chief Tim Young of the Topsham Police Department
> regarding this homicide.  Chief Young was a Detective for the Brunswick Police
> Department at the time of this homicide.  Chief Young advised me that a Jack Frost and
> a Charlie McKinney Sr. went to the Pelletier residence at the Lynn Haven Trailer Park
> in Brunswick Maine for the purpose of robbing Pelletier of drugs.  Jack Frost was
> armed with a firearm and another person within the Pelletier residence who was
> visiting Pelletier disarmed Frost, and in the struggle Frost was shot and killed.
> Charlie McKinney Sr. was also shot as he was fleeing the scene.  Chief Young took an
> active role in conducting interviews in the follow-up investigation involving this
> homicide.

*Id*. at 7.[6]  Woodman requested a no-knock and nighttime search warrant on the bases that:

> [B]oth [Pelletier's confederate] and Pelletier have surveillance camera's [sic] set up
> around their residences.  I know that people who sell drugs and have surveillance
> camera's [sic] set up around their residences have these for security and to detect law
> enforcement presence.  I also know that Pelletier has been involved in a violent act
> where a person was killed at his residence in the past.  I do not know if Pelletier will

---

[6] At hearing, Clifford denied that he was aware on January 21, 2005 that Jack Frost and another individual had broken down
Pelletier's door, were armed and were attempting to rob Pelletier.  Clifford stated that he had been told only that a drug deal had gone
bad.

be at his residence or at [his confederate's] residence, and Pelletier has an active federal arrest warrant for violation of parole and has been evading law enforcement recently.  I also know that both heroin and cocaine are easily destroyed and if persons within the residence are pre-warned of law enforcement presence they can destroy this evidence, and or barricade, fight and or possibly harm officers executing a search warrant at their residence[.]

*Id*. at 9.

After the operational meeting, officers and agents headed for the Augusta Road Residence, taking care to park far enough away so as not to spotted by the surveillance cameras.  At about 7 a.m. a team of six "entry" officers made its way through some woods to the back side of the residence and proceeded from there to the front door.[7]  The officers lined up behind a special agent who rammed the door open with some difficulty. Upon entering, the team discovered the cause of the problem: A steel pipe or rod had been braced against the door.  The officers encountered Pelletier's girlfriend, Cheryl Sprague, in the bedroom but found no one else in the house, its outbuildings or cars parked nearby. DEA-HIDTA agents commenced their search of the residence for drug/narcotic evidence while a couple of other officers interviewed Sprague, who denied knowledge of Pelletier's whereabouts. Sprague also initially denied that Pelletier possessed any guns but later stated that she did not know whether he did.

Shortly afterward a woman who was identified as Sprague's sister, Jennifer Sewall, arrived at the house.  She, too, was interviewed by officers, denied knowledge of Pelletier's whereabouts and said she did not know whether he owned any guns.  She said that she lived up the road with her husband and 14-year-old son.  Clifford paid a visit to the Sewall house, learning from Sewall's

---

[7] Clifford testified that the team contained two more entry officers than is typical and that the decision to deploy six rather than four was based on factors such as the Jack Frost shooting, the alleged drug dealing at the residence and past firearms charges against Pelletier. Clifford's testimony on this point, again, was admitted to show the officers' and agents' state of mind rather than for the truth of the asserted Pelletier history.

husband John that Pelletier might be staying at a motel in Augusta. John Sewall said that he did not know whether Pelletier had guns but "wouldn't put it past him." Clifford returned to the Augusta Road Residence and falsely told Jennifer Sewall that her husband had told him she knew exactly where Pelletier was. He also read Sewall what he termed the "apprehension statute and aiding and abetting statute" – essentially warning her that concealing Pelletier's whereabouts amounted to a criminal offense. Sewall would not look Clifford in the face and began to cry. She told him that Pelletier was residing in Room 151 of the Econo Lodge Motel ("Econo Lodge") in Augusta, Maine.

Clifford, Thibodeau and others from the original entry team headed for the Econo Lodge, arriving there at approximately 9 a.m. There they were joined by other law-enforcement officers who had been notified of the planned arrest at the motel, including members of the Augusta Police Department.[8] Clifford learned that Room 151 was registered to Jennifer Sewall. Clifford and a DEA agent, Randy St. Laurent, spoke with a maintenance man, showing him a picture of Pelletier. The maintenance man positively identified him as the man occupying Room 151. He explained that the previous day he had been called upon to do maintenance work in that room, had let himself in after knocking loudly and receiving no answer, and had observed Pelletier in bed sleeping. The maintenance man did not indicate that Pelletier was aggressive or hostile or possessed drugs or firearms. If anything, he indicated that Pelletier had been passive, hardly stirring in his bed while the man worked. The maintenance man offered the officers a passkey to Room 151, which they accepted.

At about 9:30 a.m. Clifford and several other officers (he estimated about six to eight altogether) lined up on the left side of the front door to Room 151. The room had only one means of

---

[8] In addition to MDEA agents conducting a search pursuant to the state warrant, two deputy marshals remained at the Augusta Road Residence to ensure that neither Sprague nor Jennifer Sewall tried to warn Pelletier of the impending arrest. However, Clifford learned prior to entry of the motel room that the marshals had permitted Jennifer Sewall to leave the residence, as a result of which he remained
*(continued on next page)*

egress – the door in front of which the officers stood.  Clifford and Thibodeau acknowledged on cross-examination that it was not possible for Pelletier to escape.  However, Clifford still harbored concerns about officer safety.  He observed that the outer wall of the motel consisted mostly of large plate-glass windows – an architectural feature that in his view left officers more vulnerable because a suspect could simply shoot at them straight through the glass.  *See* Dft's Exhs. 1 & 1A.  In addition, although Clifford had no confirmed report of the presence of drugs at the motel, he had been informed that Pelletier was involved in narcotics trafficking and knew from his training and experience that drug traffickers and users typically brought drugs with them when they moved from one location to another.  While Clifford possessed no information suggesting that Pelletier had carried a firearm at any time since the 1990 firearm-possession charge, Sprague had been evasive, first stating that Pelletier did not have a firearm and then stating that she did not know whether he did, and John Sewall had stated he would not put it past Pelletier to carry one.  In addition, Clifford harbored the opinion that a person who had once carried a firearm was likely to carry one again.  Clifford also was concerned about the Jack Frost incident, as he understood it.

After satisfying himself that no passerby or motel worker was in harm's way, Clifford knocked on the door four or five times loudly in rapid succession.  He placed his ear to the door, heard nothing and motioned his fellow officers to line up on the other side of the door.  As soon as they had done so – approximately ten to fifteen seconds after he had first knocked – he swiped the passkey through the lock, opened the door, started yelling, "Police," and stood aside to allow the other officers to enter first.  As the others entered, they too yelled, "Police!"  Gilliam, who was the second or third officer to cross the threshold, observed a male lying on his stomach in bed.  Other officers shouted at the male

---

concerned that she might tip Pelletier off to the imminent arrival of the police.

not to move, handcuffed him and rolled him over, whereupon Gilliam observed he was Pelletier. Pelletier offered no resistance, complying with all instructions given him.

By the time Clifford entered, Pelletier already was being handcuffed face-down on his bed. Clifford saw drug paraphernalia, including a glass pipe, steel wool, a propane torch and baggies, in plain view. The drawer of a nightstand adjacent to (actually touching) Pelletier's bed was open part-way, and Clifford observed that it contained a great deal of cash, some paperwork and a closed Tupperware container. He could see that something was inside the container but could not tell what it was. Meanwhile, officers rapidly "secured" the room, moving furniture (including the nightstand) aside, peering under the bed and checking the bedclothes and bathroom for evidence of firearms or confederates of Pelletier. No firearms or confederates were found during this approximately minute-long search.

After the room was secured, Thibodeau and his fellow DEA-HIDTA task force special agent Greg Boucher (who were not part of the "entry" team and had stood further back from the motel door than the others) joined their colleagues in Room 151. Thibodeau immediately observed a great deal of drug paraphernalia, including prescription bottles and some plastic bags on the nightstand, a propane torch on the floor next to the nightstand, hypodermic needles and a small stainless-steel cup containing water and a white substance at the bottom. In Thibodeau's experience, propane torches are used to process powdered cocaine into crack cocaine. Upon approaching the nightstand Thibodeau also noticed, in its open drawer, a large amount of currency, some hypodermic needles and a small red Tupperware container. Based on Thibodeau's training and experience, the Tupperware was of a size capable of containing narcotics.

Clifford advised Pelletier that he was under arrest for parole violations; Pelletier asked what they were, and Clifford told him. Boucher moved a chair near the bed, sat down on it and faced

9

Pelletier, who had been sat upright, still handcuffed, on the bed.  Thibodeau witnessed, and Clifford overheard, Boucher advise Pelletier of his *Miranda* rights.  Clifford heard Boucher go through the entire litany of rights and ask Pelletier if he understood them.  Thibodeau witnessed Boucher reading the *Miranda* rights verbatim aloud to Pelletier from a DEA 13-A card.[9]  *See* Gov't Exh. 2.  Pelletier indicated he understood his rights.[10]  Thibodeau stated that Pelletier initially may have been sleepy but asked for and was given a glass of water.  Boucher did most of the interviewing of Pelletier while Thibodeau proceeded to gather evidence.

In the process of collecting evidence, Thibodeau placed many (but not all) of the items he had gathered on a desk in the motel room and photographed them.  *See* Dft's Exh. 5.  Some items depicted in the photograph are not listed in an inventory of items seized and sent to a DEA drug laboratory in New York, including the propane torch, the stainless-steel cup and a lighter. *Compare* Dft's Exh. 4 *with* Dft's Exh. 5.  Thibodeau might not have taken the torch out of the room because a torch can be used for purposes other than cocaine preparation.  Hypodermic needles might either have been broken and thrown away on site or stored in a "non-drug vault" in Portland, Maine.  It is not unusual for agents to leave behind some items that do not pertain to their investigation.

While Thibodeau gathered evidence, Boucher asked if Pelletier had any information to share.  Pelletier replied, and repeated several times, "All I want to know is what can you do for me."  Neither Clifford, Thibodeau  nor Gilliam  heard Boucher or any other officer make threats or promises to Pelletier.  Instead, Clifford testified,  the agents were trying "to slow him down," stating that they

---

[9] Per *Miranda v. Arizona*, 384 U.S. 436 (1966), an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."  *Miranda*, 384 U.S. at 478-79.  The form used by Boucher conveys these rights.  *See* Gov't Exh. 2.

[10] Pelletier testified at hearing that his *Miranda* rights "may have been read" but that he did not recall them having been read.  As indicated in the text, I credit the testimony of Clifford and Thibodeau in this regard.

would see first what information he could provide and then contact the United States Attorney's office regarding his cooperation.[11]   At no time did Pelletier ask for an attorney or indicate that he no longer wanted to speak with agents.   He was very cooperative and responsive to all questions asked of him. While Boucher was interviewing Pelletier, Thibodeau stopped near the nightstand and asked, "Is this all that you have right here or is there something hidden in the room that we need to be concerned about?"   Pelletier replied, "No, you've got it all right there in the red container."   Thibodeau opened the container and found a large amount of heroin inside.   The Boucher-Thibodeau interview, which commenced within ten to fifteen minutes of the officers' initial entry, lasted fifteen to twenty minutes, following which TPD Detective Gilliam moved Pelletier to a kitchenette area of the motel room and interviewed him there.

## II.  Discussion

In his Motion, Pelletier argued  that (i) on January 21, 2005 officers failed to knock and

---

[11] At the hearing Pelletier told a different story, albeit not entirely consistently on direct and cross-examination.  On direct examination, he testified to the following.  When officers began questioning him, he sat quietly on the bed.  Then one of the officers (he did not know which) stated, "You're in deep shit."  The officer warned him that he was a career criminal and would be looking at life in prison if he did not cooperate.  Pelletier told the officer that he could not cooperate because of a stipulation in his parole conditions.  The officer reassured him that he (the officer) was aware of that condition and Pelletier was expected to cooperate.  The officer then found and picked up a crack pipe and stated, "We've got you now."  He added, "We can forget about this stuff," threw the pipe on the floor, stepped on it and threw it into the trash.  Pelletier took this to mean that the officers would forget about all contraband they had found in the room if he cooperated.  Pelletier then told them everything they wanted to know.  But for that promise, he would not have cooperated because he knew anything he said could be used against him.  On cross-examination, Pelletier described the pipe incident somewhat differently, stating that when the agent picked up the pipe and declared, "We've got you now" and "We can forget about this stuff," he had "the other stuff in his other hand."  For several reasons, I do not find Pelletier's version of events credible.  First, in Pelletier's initial recitation, he omitted the seemingly significant fact that the agent had the "other stuff" in his other hand when throwing down the pipe.  Second, it would have been physically impossible for the agent to have held the rest of the evidence, which included a blow torch, a wad of cash and several hypodermic needles, in his other hand.  See Dft's Exh. 5.  Third, all three of the government's witnesses, Clifford, Thibodeau and Gilliam, testified under oath that they overheard no one making threats or promises to Pelletier.  Fourth, Thibodeau expressly testified that he at no time observed anyone throwing down and stomping on a glass object in Room 151.   He admitted that he was focused on collecting evidence and was not continuously paying attention to the conversation between Boucher and Pelletier; however, the motel room was small, and it is difficult to believe such a dramatic gesture would have escaped his notice.  In any event, as the government points out, *see* Government's Post-Hearing Brief at 30, even assuming *arguendo* that an agent did throw down the pipe and declare, "We can forget about this stuff," there is no evidence that he explicitly stated he would drop charges regarding the heroin if Pelletier cooperated.  Rather, Pelletier testified, "I figured, which I should not have, that he was talking about the evidence that he had."

announce their presence in the manner required by 18 U.S.C. § 3109 and the Fourth Amendment to the United States Constitution, *see* Motion at 4-9, as a result of which all evidence collected and statements made should be suppressed as "fruits of the poisonous tree" per *Wong Sun v. United States*, 371 U.S. 471 (1963), *see id*. at 11; *see also* Defendant's Response to Government's Supplemental Brief in Opposition to Defendant's Motion To Suppress Evidence ("Defendant's Post-Hearing Brief") (Docket No. 45) at 17, (ii) as a threshold matter, the court should determine whether the administrative warrant was sufficient to justify the intrusion, *see* Motion at 10; (iii) while the search and seizure of items at the motel room purportedly was undertaken in connection with Pelletier's arrest for parole violations, it actually was conducted for drug-investigation purposes, as a result of which a search warrant should have been obtained, *see id*. at 10-11, and (iv) Pelletier's statements should be suppressed not only as "fruits of the poisonous tree" but also on the basis that they were made involuntarily and in the absence of a proper *Miranda* warning, *see id*. at 11-12.

At hearing, defense counsel narrowed the scope of issues remaining in contention, stating that he continued to press only his knock-and-announce and involuntariness-of-statement arguments. He reserved the right to reconsider and possibly brief his point regarding the threshold sufficiency of the administrative warrant; however, he subsequently omitted it from his post-hearing brief, thereby waiving it. *See generally* Defendant's Post-Hearing Brief. In that brief, he unexpectedly resurrected his argument concerning lack of a proper *Miranda* warning, *see id*. at 17; however, the government joined issue on the matter rather than objecting to its reassertion, *see* Government's Reply to Defendant's Response to the Government's Supplemental Brief in Opposition to Defendant's Motion To Suppress Evidence ("Government's Post-Hearing Reply") (Docket No. 47) at 10, and hence I address its merits.

For her part, government counsel conceded at hearing and in her post-hearing reply brief that

12

officers did not follow default knock-and-announce rules in that they did not identify themselves or announce their purpose prior to their entry into the motel room. *See* Government's Post-Hearing Reply at 7. She clarified that, with respect to the defendant's knock-and-announce argument, the government relies solely on exceptions to the default rules that pertain in exigent circumstances. *See* Government's Objection to Defendant's Motion To Suppress Evidence, etc. ("Objection") (Docket No. 28) at 13-16; Government's Post-Hearing Brief at 19-25.

For the reasons that follow, I find that the government meets its burden of proving (i) exigent circumstances justifying non-compliance with knock-and-announce requirements, in the form of reasonable suspicion of danger to officer safety or, alternatively, risk of destruction of evidence, (ii) administration of a proper *Miranda* warning and (iii) voluntariness of Pelletier's statements.

### A. Knock and Announce

As a matter of the Fourth Amendment's general proscription against unreasonable searches and seizures, "[p]olice acting under a warrant usually are required to announce their presence and purpose, including by knocking, before attempting forcible entry, unless circumstances exist which render such an announcement unreasonable[,]" *United States v. Sargent*, 319 F.3d 4, 8 (1st Cir. 2003). After knocking and announcing their purpose, officers must wait a reasonable period of time before effectuating a forcible entry. *See, e.g., United States v. Sherman*, 344 F. Supp.2d 223, 228-29 (D. Me. 2004), *modified on other grounds*, No. CR-04-11-B-W, 2005 WL 757687 (D. Me. 2005). This rule "recognizes the deep privacy and personal integrity interests people have in their homes. It also serves to protect the safety of police officers by preventing the occupant from taking defensive measures against a perceived unlawful intruder." *Sargent*, 319 F.3d at 8 (footnote omitted).[12]

---

[12] The government does not contest Pelletier's standing to challenge the reasonableness of the entry into the motel room in which he
*(continued on next page)*

Nonetheless, the First Circuit has listed four categories of exigent circumstances that excuse non-adherence to the default rule: "1) risk to the lives or health of the investigating officers; 2) risk that the evidence sought will be destroyed; 3) risk that the person sought will escape from the premises; and 4) '[h]ot pursuit' of a fleeing felon." *Sherman*, 344 F. Supp.2d at 232.  The government invokes three of these exceptions: potential danger to the officers, risk of flight and risk of destruction of evidence.  *See* Objection at 13-16; Government's Post-Hearing Brief at 19-25.[13]  It also argues that knocking and announcing in this case would have been futile – another recognized exception to the rule.  *See* Objection at 14; *United States v. Diehl*, 276 F.3d 32, 44 (1st Cir. 2002).

As the government acknowledges, it bears the burden of establishing the existence of reasonable suspicion of a claimed exigency when a no-knock-and-announce entry is challenged.  *See* Objection at 11; *see also, e.g., Richards v. Wisconsin*, 520 U.S. 385, 394-95 (1997) ("In order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence. This standard – as opposed to a probable-cause requirement – strikes the appropriate balance between the legitimate law enforcement concerns at issue in the execution of search warrants and the individual privacy interests affected by no-knock entries.  This showing is not high, but the police should be required to make it whenever the reasonableness of a no-knock entry is challenged.") (citations omitted).  As the First Circuit has noted, "The Supreme Court in *Richards* imported the 'reasonable

---

was staying.  *See* Objection at 9-10.

[13] The knock-and-announce statute on which Pelletier relies provides in its entirety: "The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant." 18 U.S.C. § 3109.  The Supreme Court has construed this language as codifying the common-law rule and exceptions that inform Fourth Amendment analysis, *see, e.g., United States v. Ramirez*, 523 U.S. 65, 73 (1998), and hence its invocation does not necessitate a *(continued on next page)*

suspicion' test from *Terry v. Ohio*, 392 U.S. 1 [] (1968), which requires that an officer be able to point to specific and articulable facts and have at least a minimal level of objective justification." *Sargent*, 319 F.3d at 9 (citations and internal quotation marks omitted). The lawfulness of entry is assessed based upon "what the officers had reason to believe at the time of their entry." *Ker v. California*, 374 U.S. 23, 40-41 n.12 (1963) (emphasis omitted).

While recognizing that felony drug investigations "may frequently involve" both safety and destruction-of-evidence concerns, *see Richards*, 520 U.S. at 391, the Supreme Court in *Richards* declined to carve out a *per se* exception to the default knock-and-announce rules for this category of investigations, ruling that the case-by-case "reasonable suspicion" test must be met, *see id.* at 394-95; *see also, e.g., Sherman*, 344 F. Supp.2d at 232 (observing that, for purposes of exceptions to knock-and-announce rule, the inherent risk that any suspected drug dealer could be violent is not in itself enough to show reasonable suspicion of dangerousness).

With these precepts in mind, I turn to the government's safety-exigency argument. The government points out that prior to attempting to effectuate Pelletier's arrest, agents knew that (i) Pelletier was a convicted criminal with a substantial criminal history that included at least one firearms charge, (ii) a state-court judge had issued a no-knock search warrant for Pelletier's primary residence in part because he had been involved in, or at least present during, a homicide and shooting that occurred at his residence in connection with a drug deal, (iii) the parole violation for which Pelletier was wanted was continued drug use (as evidenced by his positive urine tests), (iv) there was probable cause to believe that Pelletier had been trafficking in heroin and cocaine, and (v) Pelletier reportedly had set up surveillance equipment outside his primary residence and had constructed an

_____

separate analysis.

escape hatch within it, from which police could draw a reasonable inference that Pelletier had made fairly sophisticated attempts to be informed of, and readily be able to flee from or resist, law-enforcement presence.  *See* Government's Post-Hearing Brief at 22-23.

The government asserts that, on the day of the arrest, the agents' fears were reasonably heightened when, *inter alia*, they (i) confronted the barricaded front door at the Augusta Road Residence, from which they reasonably could conclude the defendant was trying to buy time to flee or dispose of evidence upon the arrival of police, (ii) encountered evasive behavior on the part of Sprague and Sewall, (iii) heard John Sewall's comment that he would not put it past Pelletier to possess a gun, (iv) learned that Jennifer Sewall had been released from detention at the Augusta Road Residence (and thus might warn Pelletier of agents' pursuit of him at the Econo Lodge), and (v) ended up effectuating Pelletier's arrest at a small motel room in a public area where they were easily exposed through windows, drugs such as heroin and cocaine could be disposed of quickly, and a convicted felon could readily reach for a weapon.  *See id.* at 23-25.

The government finally suggests that Pelletier's status as a parole violator is significant for purposes of exigency analysis.  *See id.* at 15; Government's Post-Hearing Reply at 9-10; *see also, e.g., United States v. Cardona*, 903 F.2d 60, 68 (1st Cir. 1990) (noting, with respect to lawfulness of use of police rather than parole officers to arrest parole violators, "Common sense suggests that retaking parolees is apt to be hazardous duty.").

For his part, Pelletier underscores the agents' lack of information that he at any time recently had possessed a firearm, had any sort of violent past or displayed any other tendency toward violence.  *See* Defendant's Post-Hearing Brief at 15-16.  Indeed, on cross-examination, defense counsel elicited that (i) officers had no fresh information that Pelletier possessed firearms, (ii) the NCIC report clearly showed (although Clifford missed it when he reviewed it) that a ten-year-old charge of firearms

16

possession against Pelletier was dismissed, (iii) Gilliam had not seen any evidence of firearms in the Augusta Road Residence when he was present there in early January 2005, and (iv) Jack Frost was killed in 1995 after attempting an armed robbery of Pelletier's then-residence in Brunswick, and no charges were brought against Pelletier in connection with the incident.

Pelletier posits that these facts compel a decision in his favor inasmuch as "[i]n order to justify a no-knock entry based on officer safety, the government must prove that the officers possessed information that the suspect was armed and likely to use a weapon or become violent." *Id*. at 13. For this proposition he relies on citation to a handful of cases from other jurisdictions. *See id*. at 14. Assuming *arguendo* that these cases do in fact stand for that proposition, the First Circuit has flatly rejected it. *See Sargent*, 319 F.3d at 11 ("[T]here is no requirement that officers serving a search warrant have evidence of the defendant's prior use of violence or even of his particularized propensity for violence in order for exigent circumstances to exist. Such evidence will, of course, make it easier to establish a reasonable suspicion of a threat. But the absence of such evidence does not establish there is no reasonable suspicion of a threat.").

This, in turn, is consistent with the First Circuit's oft-repeated admonition that the burden of making a showing of "reasonable suspicion" is not onerous. *See, e.g., United States v. Collazo-Aponte*, 216 F.3d 163, 186 (1st Cir. 2000), *vacated on other grounds*, 532 U.S. 1036 (2001) ("[T]he Supreme Court's standard of reasonableness for Fourth Amendment purposes is comparatively generous to the police in cases where potential danger, emergency conditions or other exigent circumstances are present.") (citation and internal punctuation omitted); *United States v. Hawkins*, 139 F.3d 29, 32 (1st Cir. 1998) ("Although there is a presumption in favor of announcement, i.e., knocking or some similar gesture, this postulate yields under circumstances presenting a threat of physical violence. The burden that must be met by the police to validate a "no-knock" entry is not

17

high.) (citations and internal punctuation omitted); *United States v. Jewell*, 60 F.3d 20, 23 (1st Cir. 1995) ("[T]he Federal Constitution does not require state authorities, before they issue a "no-knock" warrant, to have probable cause to believe that entry without knocking is required.  All that is required is that it be reasonable under the circumstances to allow an unannounced entry.").

Turning to the totality of the circumstances here presented, I am satisfied that the government has demonstrated that officers lined up outside Pelletier's motel room on the morning of January 21, 2005 reasonably could have feared for their safety, such as to justify their rapid entry, despite lack of any evidence that Pelletier currently possessed a weapon.  This is so in view of:

1.      Pelletier's lengthy criminal history, which included the dismissed firearms charge, and his status as a parole violator.  As Clifford reasonably explained, an officer concerned with safety does not care whether a firearms charge was dismissed: The mere fact that the charge was brought indicates that the suspect did in fact once possess a firearm.  Clifford had reason to believe, based on his training and experience, that people who once possessed firearms tended to possess them again. With respect to parole violators, the First Circuit has recognized, albeit in a different context than consideration of officer-safety exigencies, that "[c]ommon sense suggests that retaking parolees is apt to be hazardous duty."  *Cardona*, 903 F.2d at 68 (noting that "parole caters, by and large, to a more hardened group of offenders, punished more severely for more imposing crimes" than does probation).  While this recognition, alone, could not justify invocation of the officer-safety exception, I see no reason to exclude it from the mix of factors relevant to analysis.

2.      Information obtained by Clifford to the effect that approximately ten years earlier an individual named Jack Frost had been shot and killed inside Pelletier's home as a result of a drug deal

gone bad.[14]

3.     Indicia that Pelletier knew he was wanted by law enforcement, was actively attempting to evade capture and was willing to go to some lengths to do so, including his absence from his primary residence and his use at his residence of surveillance cameras, a trap door and a wedge against the inside of the front door.

4.     The likelihood that Pelletier, a known drug user and suspected drug trafficker, had taken drugs with him when he moved to the Econo Lodge.

5.     The possibility that Jennifer Sewall, who had been released from detention at the Augusta Road Residence prior to Pelletier's arrest, might have tipped him off to their imminent arrival.

6.     Sprague's statement that she did not know whether Pelletier possessed firearms, made on the heels of her initial denial that he did, coupled with John Sewall's comment that he would not put it past Pelletier to possess them.  These statements reasonably could have given the officers cause for concern, particularly in view of factors 1 through 5, above.

7.     The architecture of the Econo Lodge, the plate glass windows of which made the officers more vulnerable to attack.

All told, despite the lack of evidence that Pelletier currently possessed a weapon or, apart from the ten-year-old Jack Frost incident, had any connection whatsoever to acts of violence, officers reasonably could have feared for their safety in view of Pelletier's lengthy criminal history and status as a parole violator, the Jack Frost incident (which the officers understood to have involved a shooting

---

[14] Certain officers, notably Gilliam and Woodman, had a different (and arguably more accurate) understanding of this event as of the day of Pelletier's arrest, with Woodman having stated in his affidavit: "Jack Frost was armed with a firearm and another person within the Pelletier residence who was visiting Pelletier disarmed Frost, and in the struggle Frost was shot and killed."  Gov't Exh. 1B at 7.
*(continued on next page)*

death inside Pelletier's residence as a result of a drug deal gone bad), the prior charge of firearms possession, the chance that Jennifer Sewall might have tipped Pelletier off that police were *en route*, the worrisome statement of John Sewall that he would not put it past Pelletier to possess a gun, and Pelletier's suspected drug trafficking and usage.  Given their vulnerable position outside the large plate-glass windows of the motel, officers reasonably could have chosen to err on the side of caution by entering rapidly (within fifteen seconds of knocking), simultaneously announcing their identity and announcing their purpose after the fact.

Anticipating that a reviewing court might disagree with this analysis, I proceed to consider one of the government's alternative justifications for the officers' non-compliance with default knock-and-announce rules: feared destruction of evidence.[15]  Here, the government handily meets its modest burden of demonstrating reasonable suspicion of the existence of the claimed exigency, in view of:

1.    Woodman's information that Pelletier and an associate were trafficking in heroin and cocaine, which officers knew had persuaded a state-court judge to issue a search warrant that necessarily would have been predicated on a finding of probable cause to believe such drug trafficking was transpiring.

2.    Pelletier's own continuing drug use, evidenced by the positive urine tests that had led to issuance of his parole-violation arrest warrant.

3.    Woodman's averment, in his affidavit supporting the state search warrant, that, per his training and experience, heroin and cocaine are easily disposed of – a proposition that the defendant does not appear to contest.  *See* Defendant's Post-Hearing Brief at 11-12 (stating, "Concededly, the

---

However, even Woodman went on to summarize: "I . . . know that Pelletier has been involved in a violent act where a person was killed at his residence in the past."  *Id*. at 9.

[15] I need not and do not address the government's risk-of-flight and futility arguments.

fact that easily disposable drugs may be present lessens the amount of time between the officer's knock-and-announce and the entry"; noting that heroin is an easily disposable drug).[16]

4.     Woodman's averment that Pelletier was aware that he was being sought by police, which officers reasonably could have viewed as corroborated upon their entry at the Augusta Road Residence by his absence from his residence, the absence of any sign of drug trafficking and the evasiveness of both Sprague and Sewall regarding his whereabouts.

5.     The lengths to which Pelletier had gone to detect and prevent entry by law enforcement, including mounting surveillance cameras on his house, barricading his front door with a wedge and installing a trap door within his home, from which the police could draw a reasonable inference that Pelletier wanted, *inter alia*, to buy time to dispose of evidence.

6.     Jennifer Sewall's eventual disclosure that Pelletier was residing at the Econo Lodge coupled with Clifford's knowledge, per his training and experience, that drug traffickers and users typically bring drugs with them when they move from one location to another.[17]

---

[16] Pelletier does assert that because Clifford believed he had a large amount of drugs, "which would have made imminent destruction even more implausible." Defendant's Post-Hearing Brief at 3. However, Clifford did not testify that he believed Pelletier possessed a large quantity of drugs but rather that he was dealing in a greater volume of narcotics than Clifford originally thought.

[17] Pelletier argues that analysis of whether the government has demonstrated a drug-destruction exigency sufficient to dispense with knock-and-announce formalities entails "a two prong inquiry: (1) there must be probable cause to believe contraband is present, and (2) based on the surrounding circumstances or the information at hand, the law enforcement officers must reasonably conclude that the evidence will be destroyed or removed before they can secure a search warrant." Defendant's Post-Hearing Brief at 11. The case he cites in support of this proposition, *United States v. Rubin*, 474 F.2d 262 (3d Cir. 1973), is inapposite; it concerns the circumstances under which a warrantless search for contraband is justified, not the circumstances in which knock-and-announce formalities may be foregone, *see Rubin*, 474 F.2d at 268. Although officers in this case did not have a warrant to search the motel room, they did have an arrest warrant, the validity of which Pelletier no longer challenges, which independently justified their entry into the room. The question whether, in effectuating that entry, they had reasonable suspicion of an exigency sufficient to dispense with knock-and-announce formalities is a separate one that clearly is determined on a standard of reasonable suspicion, not probable cause. *See, e.g., Jewell*, 60 F.3d at 23. That the entry was made for purposes of arrest did not, as Pelletier seems to suggest, *see* Defendant's Post-Hearing Brief at 12, preclude the entry team from taking into consideration its collective knowledge of exigent circumstances, including those related more to the state drug investigation than to the federal arrest. In any event, even assuming *arguendo* that the government must, in these circumstances, demonstrate that officers had probable cause to believe Pelletier possessed contraband at the motel room, it has done so. As a state judge found, there was probable cause to believe Pelletier was trafficking in heroin and cocaine from his residence. When officers found Pelletier absent from his residence and Sprague and Sewall evasive about his whereabouts, they reasonably could

*(continued on next page)*

7.      The Econo Lodge maintenance man's confirmation that the man occupying Room 151, which was registered to Jennifer Sewall, was Pelletier.

8.      The small size of the motel room, which would facilitate ready disposal of drugs.

9.      The possibility that Jennifer Sewall, who had been released from detention at the Augusta Road Residence and had shown sufficient loyalty to Pelletier to lie to police to protect him, might have tipped him off that the police were *en route*.

10.      The silence emanating from the motel room in the approximately ten to fifteen seconds after Clifford knocked on the door, at a time of day when the occupant reasonably could have been expected to be awake if present.  While defense counsel repeatedly argues (without citation to authority) that  silence cuts against a reasonable inference that Pelletier was disposing of drugs, *see* Defendant's Post-Hearing Brief at 2-3, 5 n.5, 7 & 13, silence is equally (if not more) compatible with a reasonable inference that Pelletier was doing just that, *see, e.g., United States v. Lucht*, 18 F.3d 541, 549 (8th Cir. 1994) ("Although Lucht argues that mere silence cannot be construed as access denied, we note that rarely if ever is there an affirmative refusal.  More often the officers meet with silence as the occupants seek to destroy evidence or escape.") (citation and internal punctuation omitted).

The foregoing specific, articulable facts suffice to substantiate the existence of reasonable suspicion to believe that Pelletier had drugs in Room 151 of the Econo Lodge and was able and inclined to destroy them quickly upon learning of the police's arrival.

In sum, although officers failed to comply with the knock-and-announce rules of 18 U.S.C.

---

have inferred, from their training and experience, that Pelletier more likely than not had taken drugs with him to his temporary place of residence, the Econo Lodge motel room.  *See, e.g., United States v. Bartelho*, 71 F.3d 436, 441 (1st Cir. 1995) ("Probable cause to conduct a search exists when[,] given all the circumstances, there is a fair probability that contraband or evidence will be found in the *(continued on next page)*

§ 3109 and the Fourth Amendment, their non-compliance was justified by reasonable concern for officer safety or, alternatively, feared destruction of evidence. The entry accordingly was lawful.

### B.  Search and Seizure

As the government points out, *see* Government's Post-Hearing Brief at 26, Pelletier rests his argument for exclusion of tangible evidence seized from his motel room solely on asserted non-compliance with knock-and-announce rules, obviating the need to consider whether, once entry was gained, the ensuing search and seizure was otherwise lawful, *see* Defendant's Post-Hearing Brief at 17. In any event, even assuming *arguendo* that Pelletier presses this point, the government meets its burden of justifying the search and seizure on the bases that (i) the majority of the objects were in plain view, and (ii) officers otherwise conducted a proper search incident to arrest. *See* Objection at 16.

 "It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." *United States v. Meada*, 408 F.3d 14, 23 (1st Cir. 2005) (citation and internal quotation marks omitted). Most of the items seized from Pelletier's motel room fit this description. They were plainly visible as the officers entered the room. Several officers also testified that they viewed cash and a closed Tupperware container inside a partially open nightstand drawer. The cash falls within the "plain view" exception but not the closed container. Clifford testified that upon viewing it he was not able to discern what was inside. Thibodeau testified that, given the size of the Tupperware, it could have contained drugs. Those observations do not suffice to place contents of a closed container within the "plain view" exception. *See, e.g., id.* ("Not all containers and packages found by police during the course of a search will deserve the full protection of the Fourth Amendment. Thus, some containers

---

place described.") (citation and internal quotation marks omitted).

(for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance."). Whereas the container at issue in *Meada* was "readily identifiable as a gun case[,]" *id*., the Tupperware in Pelletier's nightstand drawer was a generic container, capable of, but not necessarily, containing drugs.

Nonetheless, as the government suggests, *see* Objection at 19, the Tupperware container properly was searched incident to arrest. As the First Circuit has observed, "it is . . . well settled that a search incident to a valid arrest may be made without procurance of a warrant." *United States v. Cruz Jimenez*, 894 F.2d 1, 7 (1st Cir. 1990). The search must be limited to "an area in the immediate control of the defendant[.]" *Id*. An officer properly may search the contents of a closed container incident to an arrest if the container was "in hand or within reach when the arrest occurs, even if the officer has since seized it and gained exclusive control over it[,]" so long as the search "is contemporaneous with and an integral part of a lawful arrest[.]" *United States v. Wesley*, 293 F.3d 541, 547 (D.C. Cir. 2002) (citation and internal quotation marks omitted); *see also, e.g., United States v. Nelson*, 102 F.3d 1344, 1346 (4th Cir. 1996) ("Although the 'incident to arrest' justification for warrantless searches does not permit an indefinite delay in a search, the justification does last for a reasonable time after the officers obtain exclusive control of the container that is to be searched.") (citations omitted). The Tupperware container, which was in the drawer of a nightstand adjacent to the bed on which Pelletier was sleeping, was in an area within his immediate control at the time of his arrest. Thibodeau searched it within approximately twenty minutes of the officers' entry – contemporaneously with, and as an integral part of, Pelletier's lawful arrest.

### C.  Lack of Proper *Miranda* Warning

Pelletier continues to assert, in his post-hearing brief, that he was not properly apprised of his *Miranda* rights.  *See* Defendant's Post-Hearing Brief at 17.  As the government argues, *see* Government's Post-Hearing Reply at 10, the record simply does not bear this out.  Thibodeau testified that he witnessed his colleague, Boucher, reading Pelletier his *Miranda* rights directly from the standard DEA 13-A card.  Clifford likewise recalled hearing Boucher read the *Miranda* rights to Pelletier.  Even Pelletier's hearing testimony was equivocal:  He testified that he did not recall having been read the rights but might have been.  I find that a proper *Miranda* warning was given.

### D.  Voluntariness of Statements

As the First Circuit has noted, "The requirement that a confession must be voluntary in order to be admitted into evidence rests on two constitutional bases: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment."  *United States v. Faulkingham*, 295 F.3d 85, 90 (1st Cir. 2002).  To the extent that Pelletier makes a Fifth Amendment argument, he argues, in essence, that statements were elicited in the absence of required *Miranda* warnings.  *See, e.g., id.*; *Dickerson v. United States,* 530 U.S. 428, 435 (2000) ("[In *Miranda,* we] concluded that the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself.") (citation and internal quotation marks omitted).  Inasmuch as I find that Pelletier was in fact administered a proper *Miranda* warning, this claim fails.

To the extent Pelletier presses a Fourteenth Amendment voluntariness argument, the government bears the burden of showing, based on the totality of the circumstances, that investigating

agents neither "broke" nor overbore his will. *Chambers v. Florida,* 309 U.S. 227, 239-40 (1940). As this language suggests, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly,* 479 U.S. 157, 167 (1986). *See also, e.g., Rice v. Cooper,* 148 F.3d 747, 750 (7th Cir. 1998) (in context of voluntariness of confession, "[t]he relevant constitutional principles are aimed not at protecting people from themselves but at curbing abusive practices by public officers.") (citation omitted). Although promises of leniency are relevant, the First Circuit has suggested that they do not *per se* render a confession involuntary. *See, e.g., Coombs v. State of Maine*, 202 F.3d 14, 19 (1st Cir. 2000) (noting, in habeas case, that "it is less apparent to us than to the Maine Law Court that if a promise had been made it automatically would have rendered the confession involuntary"); *United States v. Byram*, 145 F.3d 405, 408 (1st Cir. 1998) ("[I]t would be very hard to treat as *coercion* a false assurance to a suspect that he was not in danger of prosecution.") (emphasis in original).

Pelletier's Fourteenth Amendment argument is grounded on his testimony that one of the officers promised that if he cooperated, all charges against him stemming from the motel-room search would be dropped. As discussed above, I do not find that testimony credible. Rather, I have credited the testimony of the government's officer-witnesses to the effect that, from the outset, Pelletier chose to be very cooperative and repeatedly sought to extract a promise of leniency in exchange for his cooperation from the government. While the officers themselves no doubt were keenly interested in extracting information from Pelletier, they did not make specific promises but rather stated that they would discuss with the prosecution the extent to which he had cooperated.

As the government further argues, even if one were to credit Pelletier's story that the agent threw the pipe down, smashed it and said, "We can forget about this stuff," Pelletier himself admitted that he should not have assumed the agent meant all of the incriminating evidence in the room

26

(including the heroin).  *See* Government's Post-Hearing Reply at 11.  Thus, even on Pelletier's version of events, the necessary predicate of police coercion sufficient to overbear a suspect's well is absent.

In short, the facts as I propose they be found reveal that Pelletier voluntarily cooperated in the hope of gaining leniency.  Such a unilateral hope does not render a suspect's statements involuntary.  *See, e.g., United States v. Rowley*, 975 F.2d 1357, 1361 (9th Cir. 1992) ("Although Rowley's statements were given in the hope of leniency, they were not given with the promise of leniency, and thus were not involuntary on that score.").  The government accordingly meets its burden of proving that statements made by Pelletier on January 21, 2005 were made voluntarily for purposes of the Fourteenth Amendment.

### III.  Conclusion

For the foregoing reasons, I recommend that the defendant's motions to suppress evidence be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 27th day of July, 2005.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge